Charles D. **CARDILLO,** Administrator C.T.A. for the Estate of Sandra L. Cardillo, and Charles D. Cardillo, individually, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. No. N–80–40(TFGD).**

United States District Court,
D. Connecticut.

Nov. 9, 1984.

Clifford J. Shoemaker, Vienna, Va., James M.S. Ullman, Meriden, Conn., for plaintiffs.

John Hughes, Leslie Ohta, Asst. U.S. Attys., Alan H. Nevas, U.S. Atty., New Haven, Conn., Roger D. Einerson, Dept. of Justice, Civil Division, Torts Branch, Washington, D.C., for defendant.

## MEMORANDUM OF DECISION

DALY, Chief Judge.

In April of 1980, Charles Cardillo brought this action against the United States pursuant to the National Swine Flu Immunization Program Act, 42 U.S.C. § 247b, and the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2671, *et seq.* At that time, Charles Cardillo presented the claims as Conservator for the Estate of Sandra L. Cardillo as well as in his individual capacity for loss of consortium. Shortly before trial, the government moved to have the complaint dismissed as to Charles Cardillo in his individual capacity based on a failure to meet the jurisdictional prerequisites of filing an administrative claim with respect to the claim for loss of consortium. The Court noted that if liability was established, the motion would then be decided in connection with its ruling on damages. On December 12, 1983, during a recess in the course of the trial of this case, Sandra Cardillo died. Thereafter, subsequent to the filing and government rejection of an administrative claim, the complaint was amended to include a claim for wrongful death.

After transfer of this case to the United States District Court for the District of Columbia by the Judicial Panel on Multi-District Litigation, the matter was remanded to this Court for further proceedings and trial. The plaintiffs allege that Sandra Cardillo suffered from Guillain-Barre Syndrome (GBS) as a result of her receiving the Swine Flu vaccine on December 6, 1976. The government agrees that Sandra Cardillo suffered from GBS, but disputes that her case of GBS was caused by the Swine Flu vaccine. The plaintiffs and the government are in agreement that, under the terms of the order entered in the Multi-District Litigation proceedings, the first issue for this Court is to determine whether the plaintiffs have proven that Sandra Cardillo's case of GBS was caused by the Swine Flu vaccination. *In Re Swine Flu Immunization Products Liability Litigation,* M.D.L. No. 330, Misc. No. 78–0040, at ¶ IX (D.D.C.1979). If the result of this inquiry is that causation is established, the government's liability is thereby established, and damages are to be calculated and awarded. *Id.*

The plaintiffs present to the Court two alternative theories of causation. The first is that the onset of the GBS was shortly after Mrs. Cardillo received the vaccine, well within the appropriate period of time under the government's interpretation of epidemiological data concerning the likelihood of GBS being causally related to the vaccine. This theory posits that Mrs. Cardillo's case of GBS was of a "smouldering" type, which did not peak until almost 17 weeks after the vaccine was administered. The plaintiff's second theory of causation is that, even if the date of onset was 16 to 17 weeks after the vaccine was administered, the government's interpretation of the epidemiological data is significantly flawed in several respects, and accounts for an inaccurate and artificially low relative risk figure that is not actually warranted for that date of onset. Plaintiffs argue that a prop-

er interpretation of the epidemiological data demonstrates a relative risk for onset during the 16th and 17th week after vaccination sufficiently high to indicate that Mrs. Cardillo's case of GBS was more likely than not causally related to the Swine Flu vaccine.

In response, the government has two lines of defense. First, the government argues that onset of Mrs. Cardillo's case of GBS was in late March of 1977, or approximately 17 weeks after she had received the vaccine. The government asserts that the proper interpretation of the epidemiological data reveals that Mrs. Cardillo's case of GBS was not causally related to the vaccine, as the likelihood of GBS being causally related to the Swine Flu vaccine is less than 50% if onset is beyond the 8th week after vaccination. Instead, the government claims that Mrs. Cardillo had an antecedent virus in late March of 1977, to which her case of GBS is likely causally related. Second, despite the stipulation noted above, the government argues that if onset was within a few weeks of the administration of the vaccine, while the flare-up of the disease was not for another 13 to 15 weeks, then Mrs. Cardillo's disease was not GBS. Instead, the government claims that this malady was chronic idiopathic polyradiculoneuropathy (CIP), which the government describes as a malady clinically separate from GBS.

## DISCUSSION

### A. Background

Sandra Cardillo was born on December 25, 1940. After a two-year courtship, she married Charles Cardillo in 1960. Mrs. Cardillo became the mother of two boys; Charles, Jr., who was born in 1962, and Todd, who was born in 1968. Just short of her 36th birthday, on December 6, 1976, Sandra Cardillo received the Swine Flu vaccine pursuant to the nationwide government program to immunize the population against a possible epidemic of the Swine Flu. Prior to this, Mrs. Cardillo appears to have been a basically healthy and very active person.

The only noteworthy aspect of her medical history prior to this date is that in 1968 a chest x-ray revealed small calcifications in the right upper lobe and right hilum of her lung. At that time no treatment was necessary. Later, in August of 1974, Mrs. Cardillo had a physical examination related to her employment with the City of Meriden. Due to the condition that had existed in 1968, a chest x-ray was taken in 1974. This x-ray showed a primary tuberculosis complex in the right lung which was healed with evidence of calcification. Because of this condition, medication was prescribed for Mrs. Cardillo, which she took from October, 1974 through December, 1974. This medication was stopped, apparently because Mrs. Cardillo felt it had caused her to become constipated. Her constipation appears to have continued into much of 1975. Mrs. Cardillo never told Charles Cardillo of this condition in her right lung or of her taking medicine for the condition for that three-month period in 1974.

The testimony before this Court demonstrates that, prior to the Swine Flu shot, Mrs. Cardillo was a very active and energetic person who was full of vitality. Charles Cardillo testified that she was an active person who enjoyed skiing, swimming, hiking and tennis. In addition, Mrs. Cardillo played softball, made clothes, did the housework, took care of her sons and knitted and crocheted when she could. She also did some gardening, rode a motorcycle with her husband, and attended a ceramics class. Mrs. Cardillo prepared the family meals. The testimony also reflects that she baked quite a bit, particularly around family holidays. In addition, Charles and Mrs. Cardillo socialized with family, friends and neighbors.

Moreover, Mrs. Cardillo had been a working wife and mother. Mrs. Cardillo was employed at Pratt & Whitney Aircraft after her marriage in 1960 until the birth of her youngest son Todd in 1968, with the exception of the time she took off when Charles, Jr. was born in 1962. Thereafter, Mrs. Cardillo went to work in a book factory rather than returning to Pratt & Whitney. From this factory position, Mrs. Car-

dillo took a job as a school bus driver for the City of Meriden. At some point in 1974 or 1975, Mrs. Cardillo took a position with the dispatcher's office overseeing the bus drivers for the City of Meriden. While employed with the City, Mrs. Cardillo worked approximately 180 to 200 days per year. Even though she was in the dispatcher's office, Mrs. Cardillo kept her school bus driver's license so that she could substitute as a driver when needed.

Consistent with the above, all of the witnesses who described Mrs. Cardillo noted her abundance of energy and her zest for life. Nancy Minor, one of Mrs. Cardillo's friends and a co-worker of Mrs. Cardillo over the years, stated that she was "a very bubbly, energetic person, always on the go." (T. 112). And although he had difficulty remembering exactly when Mrs. Cardillo began not feeling well, Mrs. Cardillo's father-in-law, Dominic Cardillo, testified that, while he could not recall her complaining to him about specific ailments, Sandra Cardillo "was always active ..., [she] used to run around like a spring chicken, she had plenty of pep, and all of a sudden she ran out of gas, that's all." (T. 182). Mrs. Cardillo's mother-in-law, Claire Cardillo, also described Sandra Cardillo as a person "[a]lways on the go." (T. 187).

Shortly after receiving the Swine Flu vaccine, Mrs. Cardillo's condition changed. Her activities slowed down a great deal and in some instances stopped. Although she continued to go to work, she felt weak and tired and wanted to rest. She even canceled a weekend skiing trip to Vermont. Within two or three weeks after the vaccination, Mrs. Cardillo mentioned to her husband that she had a numbness in her back. After a quick look at her back, Mr. and Mrs. Cardillo dropped the subject. Before the arrival of Christmas, Mrs. Cardillo mentioned to Charles Cardillo that she had a "scratchy burning sensation in the back of her throat." (T. 9).

Christmas of 1976 was very different from prior Christmases for Mrs. Cardillo. She did not feel like decorating the house as she had done with the family in earlier years. She decided to cancel the family's Christmas trip to Maine to see her parents, and then, at the last minute, decided to go. While in Maine, however, she did not ski with the family, which for her was very unusual. Also, Mrs. Cardillo decided not to put up the Christmas tree that Christmas. In past years the tree had always been put up, even when the family took its Christmas trip to Maine. In addition, the Christmas holidays had traditionally been the time for baking cookies, pies and lasagne to bring to her parents' home in Maine. However, for the first time at Christmastime in 1976, Mrs. Cardillo did not do this baking. She also did not bake Italian meat and cheese pies to bring to Charles Cardillo's father's house as had been the custom. Charles Cardillo felt that this was because she was tired and weak.

New Year's Eve was also quite unusual for Mrs. Cardillo. She and Charles went out New Year's Eve with another couple planning to celebrate through the advent of the new calendar year. Instead, Mrs. Cardillo approached Charles around 10:30 p.m. that evening and told him that she was not feeling well and would like to go home. Mr. Cardillo informed the other couple and the Cardillos went home. Mrs. Cardillo did not specifically say what was bothering her. She did tell Charles that she felt lousy and tired.

After the holidays, Mrs. Cardillo still appeared to everyone to be run-down, weak, and tired. The testimony reflects that Mrs. Cardillo could no longer carry the laundry basket up the stairs and had her sons do this for her. Her weakness and fatigue continued throughout the winter months. Also, she mentioned to Charles Cardillo on a couple of occasions just after the turn of the year that she had a tingling sensation in her fingertips. In addition, around this time Mrs. Cardillo also mentioned to Nancy Minor that her fingertips were tingling, particularly when she was typing at work.

The sensation in her throat continued after the turn of the year. Charles Cardillo described it this way:

Then after the holidays she started complaining of something being there [in her throat], there was something there, she couldn't swallow it, she couldn't get it up. She would get over the sink and try to spit it out. It wouldn't come out. (T. 10).

Charles Cardillo, Jr. also testified that around Christmas and after his mother was habitually spitting, coughing and gagging. Mrs. Cardillo took to frequent gargling and sometimes wore a towel with Ben Gay on it wrapped around her neck. Charles Jr. testified that this was "very odd, ... a strange thing". (T. 172.) In addition, Nancy Minor testified from her observations of Mrs. Cardillo at work that she was constantly and continuously clearing her throat, and that in all the years they had worked together she had not known Mrs. Cardillo to ever have done that before. It appears from the testimony that this occurred on and off throughout the winter, up through the point where Mrs. Cardillo was hospitalized.

It also appears that during the time subsequent to her receipt of the Swine Flu vaccine, Mrs. Cardillo's bowel habits changed. Beginning sometime in January of 1977 and continuing until the time of her hospitalization, she spent much more time than usual in the bathroom and experienced intermittent episodes of diarrhea.

During March of 1977, Sandra Cardillo made two visits to physicians before she began to feel terribly ill at the end of the month and in early April. On March 1, 1977, Mrs. Cardillo visited her gynecologist, Dr. Pepe, and had a gynecological examination with normal results. Next, on March 23, 1977, Mrs. Cardillo visited Dr. White of the Meriden Health Department so that she could be re-certified as a bus driver for her employment. On the health questionnaire she filled out at this visit, Mrs. Cardillo said "no" to the following inquiries: whether she then had or had had in the past neuritis; whether she had numbness, weakness or fatigue; whether she had then, or previously had shoulder, arm or hand pains, shortness of breath, chest pain or pressure, or chronic cough; whether she had a problem with coughing, throat trouble, hoarseness, loss of appetite, nausea or depression; whether she had ever had any back trouble; and whether she had ever had or had at that time tuberculosis.

Toward the end of March of 1977, Mrs. Cardillo's symptoms became dramatically worse. She was absent from work on March 30th and 31st, and on April 1st because of severe diarrhea, muscle pain and abdominal cramps. By Sunday, April 3, she felt well enough to help her husband paint the living room ceiling with a latex paint. However, on that same day she felt some tingling in the area of her mouth and tongue.

On Monday April 4, 1977, Mrs. Cardillo woke up at 4:00 a.m. She had difficulty walking and could not walk a straight line down the hall. Her speech was garbled and she had difficulty swallowing. She again experienced the tingling sensation in her fingertips. Her husband woke up at 6:30 a.m. and, seeing her condition, wanted to take her to the hospital. Despite her protestations, Charles Cardillo took her to the emergency room at the Meriden-Wallingford Hospital. Mrs. Cardillo informed the people at the emergency room that she broke out in a rash that morning, that she recently had diarrhea for a few days and that she and her husband had painted the ceiling the day before with a latex paint. The doctors suspected that she might be having an allergic reaction to the paint and advised her to go to an ear, nose and throat specialist. She was given a shot of benadryl and a prescription for benadryl, and was discharged in just under an hour.

From the hospital, the Cardillos went to Dr. Kim, an ear nose and throat specialist. Dr. Kim suspected an allergic reaction to the paint. He prescribed some pills to calm her down. Later that day Sandra Cardillo returned to the Meridan-Wallingford Hospital. At this time she complained of hoarseness and it was noted that she had a pooling of mucous in her mouth. It was also noted that there was no urticarial rash at

that time. Also, she apparently had not yet had the benadryl prescription filled. The physician prescribed afrin for Mrs. Cardillo and advised that she continue the benadryl.

That same evening, at 9:00 p.m., Mrs. Cardillo was admitted to the Emergency Room of the World War II Veterans Hospital. From the emergency room, she was later admitted directly into the hospital. The hospital record indicates that she had awakened the previous night with substernal pain and difficulty swallowing. Upon admission, she was unable to swallow, was "constantly expectorated", and there was pooling of saliva in the hypopharynx and in the periform sinuses. Dr. Friedman, the physician at the Veterans Hospital dealing with Mrs. Cardillo, noted that she had diarrhea for 4 or 5 days prior to admission associated with muscle aches. She had also experienced a pressure sensation in her chest for approximately 16 hours prior to admission. Mrs. Cardillo had not experienced nausea or vomiting and had not had a bowel movement in the 24 hour period preceding admission. Dr. Friedman noted that she had no major illness, diabetes, hypertension, or tuberculosis. Upon examination, Dr. Friedman found that her neurological examination was "grossly within normal limits".

During the next morning, on April 5, 1977, Mrs. Cardillo was noted to have drooping of the right eyelid, weakness in the left eyelid, weakness of the upper extremities with an absence of deep tendon reflexes, bilateral peripheral facial weakness, and double vision. Because Sandra Cardillo also had difficulty breathing, she was intubated. Around midday on April 5, 1977, Mrs. Cardillo was transferred to the Yale-New Haven Hospital for care of her neurological condition, one source of which Dr. Friedman felt could have been Guillain-Barre Syndrome. (Ex. 501, p. 14). While the government asserts that Dr. Friedman had then diagnosed her illness as GBS, the Court is not convinced that this final diagnosis was made prior to her transfer to Yale-New Haven Hospital. (*See* Exh. 501, p. 8, p. 14).

At Yale-New Haven Hospital it was discovered that at the Veterans Memorial Hospital, the indotracheal tube had been placed in her esophagus rather than in her trachea. The physicians at Yale-New Haven then re-intubated Mrs. Cardillo, placing the tube in her trachea.

Dr. Higgins, the attending neurologist, Dr. Nathanson, the neurology resident, and Dr. Root each individually took Sandra Cardillo's history. It is extremely unlikely that at this time Mrs. Cardillo was able to verbally communicate with the physicians. At this time she was intubated, and prior to being intubated she had significant impairment of speech due to her neurological symptoms. The histories, then, must be viewed as having come from Charles Cardillo, and possibly from Mrs. Cardillo's parents. While Dr. Root's history indicates that it came from Mrs. Cardillo and her husband, it is likely that this is so only to the extent that Mrs. Cardillo may have moved one or the other of her feet to indicate a positive or negative response to a question, rather than by giving any verbal response or any extended communication.

These histories indicate gastrointestinal symptoms and diarrhea approximately one week prior to admission which lasted for about three days. Also, 48 hours prior to admission, Mrs. Cardillo had experienced tingling in the area of her mouth and tongue, with minor muscle weakness. The histories generally noted that her progressive upper extremity weakness began after admission to the Veterans Memorial Hospital. Her strength in the lower extremities was good, but deep tendon reflexes were absent. Both Dr. Higgins and Dr. Nathanson noted the fact and the month in which Mrs. Cardillo received the Swine Flu shot. The records show that the doctors at Yale-New Haven felt that Mrs. Cardillo had an infectious polyneuritis or GBS. However, botulism was not ruled out until sometime on April 6th.

Mrs. Cardillo's ailment progressed rapidly. She became incontinent of urine and, on April 6th, had an irregular pulse rate.

On April 7th, Mrs. Cardillo was given treatment for pneumonia. At the close of the day she had total paralysis of the bulbar muscles, which are those muscles involved in swallowing, chewing, and speech. And, on April 9th, Mrs. Cardillo was experiencing significant weakness of the lower extremities, which progressed through April 11th, and thereafter at a lesser rate. The tingling feeling she had experienced in her fingers had progressed to her toes. On April 12th, a tracheostomy was performed on Mrs. Cardillo.

On April 14, 1977, Mrs. Cardillo had an episode of cyanosis, with no palpable pulse. The respirator to which she had been attached was found disconnected. Mrs. Cardillo required bag breathing and the doctors performed external cardiac massage on her. Her pulse returned to 120 but the EEG reading was flat. By the next day, Mrs. Cardillo had a complete flaccid paralysis, with a somewhat improved EEG.

The parties agree that during the remainder of her hospitalization, Mrs. Cardillo had several episodes of cyanosis, several episodes of severe respiratory distress and hypoxia resulting in severe brain damage. Mrs. Cardillo also experienced multiple episodes of pneumonia, incidences of urinary tract infections, and suffered from anemia.

The medical records indicate that there was some improvement in Mrs. Cardillo's condition around the end of May of 1977. On May 27, it was noted that Mrs. Cardillo's eyes, and particularly her left eye, were following the movements of Dr. Higgins' hand. On May 28, it was noted that the nurses had observed that Mrs. Cardillo was, of her own volition, moving her feet on the nurse's request. Two days later, on May 30, it was noted that there was "convincing visual fixation ... on verbal stimulation". The doctor also noted that Mrs. Cardillo made certain movements on request. For that day and the next, the doctors noted that Mrs. Cardillo continued "improved" and showed increasing movements. She turned her head slowly to the right and attempted visual fixation. One doctor noted that she "appears to follow with eyes at times but still hard to be sure because of degree of spontaneous movement." On June 1, 1977, it was noted that Mrs. Cardillo was responding with "eye and leg movement on verbal cue," and that she was "better than several days ago." Another physician on June 2nd, wrote, "I am now convinced for the first time that [Mrs. Cardillo] is following with [her] eyes on command. Clear evidence of recovery." Her condition remained essentially unchanged, or possibly with slight regression, until June 16, 1977, when she suffered a hypoxic episode in association with pneumonia in which she was noted to be cyanotic. The efforts to resuscitate her resulted in a tension pneumothorax which required that a chest tube be inserted. Nevertheless, Dr. Nathanson felt that this episode did not change her neurologically.

Mrs. Cardillo's dependence on the respirator was gradually reduced so that by early October of 1977 she was completely off the respirator. However, on October 26, 1977, Mrs. Cardillo was found to be cyanotic, and breathing with difficulty, the lower lobe of her right lung having apparently collapsed. Thereafter, Mrs. Cardillo's ability to breath unassisted returned, only to suffer another respiratory arrest on December 7, 1977. She apparently did not suffer cardiac problems from this respiratory episode. On October 11, 1977, a gastrostomy was performed to facilitate feeding. An EEG on December 9, 1977 showed moderate to marked generalized slowing with lateralization. This remained essentially unchanged until her death.

Mrs. Cardillo had developed severe contractures in her hands and legs, shoulders and hips, despite vigorous physical therapy. These contractures remained and worsened until her death.

By the beginning of 1978, the doctors still noted that Mrs. Cardillo had a fair degree of head control and made semipurposeful movements of all her extremities. (Ex. 501, p. 250). By the end of January, 1978, it was noted that Sandra Cardillo had "better control of [her] head."

Shortly thereafter, on February 1, 1978, Mrs. Cardillo was transferred to the New Britain Memorial Hospital, where she had a permanent tracheostomy and required support in all activities of daily living. Her neurological condition remained essentially unchanged. The reports indicate that she was aware of voice commands since sometime in 1977, but could respond only intermittently, and with only slight movements. Mrs. Cardillo remained essentially in this state until her death. Mrs. Cardillo was transferred to the Westfield Convalescent Home in Meriden on September 6, 1983. On that same day, she was transferred to Meriden-Wallingford Hospital, where she remained until she died on December 13, 1983.

### B. *Guillain-Barre Syndrome—GBS*

GBS is a neurological disorder primarily involving the peripheral nervous system. GBS appears to have had various and evolving definitions comprised of collections of symptoms thought to indicate the syndrome. The most significant symptoms of GBS are bilateral motor weakness and loss of tendon reflexes. The variations of weakness range from mild weakness to total paralysis. Sensory abnormalities such as tingling and numbness are also common characteristics of GBS. Generally, GBS is an ascending illness, starting with the lower extremities and progressing to the upper extremities. Facial muscles and respiratory muscles may be affected. In some cases, the bulbar muscles are involved.

GBS generally is of an acute or subacute nature. In 50% of the cases the motor weakness and sensory impairment reaches its peak within two weeks from the onset of the illness. Within three weeks of onset, the illness has reached its peak in 80% of the victims. And by four weeks past onset, GBS has reached its nadir in over 90% of those afflicted. This, however, leaves approximately 10% of the cases of GBS which have not reached the peak of the illness by four weeks from onset.

At present, medical science has been unable to determine the exact cause or causes of GBS. However, GBS has been associated with numerous antecedent medical events. These antecedent events include viral infections—commonly upper respiratory infections and gastrointestinal infections—and vaccinations. Nevertheless, in approximately one-half of the cases of GBS, there is no medically identifiable antecedent event.

The plaintiffs' first theory of causation is that the onset of Mrs. Cardillo's GBS was within a few weeks of the Swine Flu vaccination. This onset, however, was marked by mild manifestations of GBS, which progressed slowly and unevenly over time, until the disease erupted in early April of 1977. The governments' theoretical response to this argument is that if the Court finds that the onset of Mrs. Cardillo's case of GBS was within a few weeks of her receipt of the vaccine, and her mild case of GBS progressed until April of 1977 when it erupted, then the illness from which Mrs. Cardillo suffered was clinically not GBS. Instead, the government asserts that such a slowly progressive polyneuritis is CIP rather than GBS.

As noted above, GBS is generally considered to have an acute or subacute progression to the nadir of the illness. Indeed, highly respected expert witnesses testified for the government that where there is a polyneuritis in a mild form with slow progression for many weeks beyond onset, that illness is CIP rather than GBS, as most experts would presently define GBS. However, the question is not whether the latest and most refined medical opinion would consider the slowly progressive polyneuritis as an entity clinically separate from GBS. Rather, the question is whether the slowly progressive polyneuritis which the plaintiffs allege Mrs. Cardillo contracted is considered to be GBS within the context of this litigation. The Court finds that it is.

First, it appears from the evidence in this case that the definition of GBS has evolved over time. Dr. Lichtenfeld testified to many articles in the medical literature which describe cases of slowly progressing

polyneuritis as GBS. With respect to earlier medical opinion, Dr. Lichtenfeld noted that in 1936 Guillain described three of ten patients that had a polyneuritis which was progressing slowly over a period of months. Dr. Lichtenfeld also noted numerous other doctors who described in recent literature long progression cases of polyneuritis as GBS. While there is, as Dr. Lichtenfeld testified, a tendency for neurologists who are writing at the present time to characterize a slowly progressive polyneuritis as a clinical entity separate from GBS, it does not appear from the record that this has been universally accepted. Courts faced with the issue of this separation in cases similar to this one have characterized the separation as "words ... of form and not of substance," *Grubbs v. United States*, 581 F.Supp. at 536 (N.D. Ind.1984), and a "question of semantics." *Dillard v. United States*, No. CV479–17, slip op. at 11. (S.D.Ga. October 30, 1981). Indeed, the evidence, and even the testimony of at least one of the government's witnesses, seems to indicate that this clinical separation in the literature is of recent vintage.

In this regard, Dr. Adams, testifying for the government in this case, indicated that chronic polyneuritis is today considered to be separate from GBS. He buttressed this statement by noting that in writings by Dr. Dyck and Dr. Aranson, found in a recent pre-print portion of a book edited by Dyck, Lambert and Thomas, there is a separate chapter for GBS and a separate chapter for chronic polyneuritis. This, Dr. Adams felt, "indicated in their thinking that the two should not be put together." At the same time, however, Dr. Adams stated that in the first edition of that book, Dr. Aranson's "ideas were a little ambiguous" on this issue, but noted that "he has now recanted and has agreed to strict separation of the two."

While Dr. Aranson and others may now agree to a "strict separation of the two," this does not bind the plaintiffs in this case. The record does not indicate that Sandra Cardillo's case of GBS, to which the plaintiffs and the government stipulated, was, by definition, an acute or subacute case of GBS. The question is whether, in the circumstances of this case, the term "GBS" included within its definition a variant which is characterized by a slow progression after onset. In this regard, the Court looks to the criteria set forth by the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS), on which the government relies in this case, and which the Multi-District Litigation Pretrial Order imposes on the government in cases where the government is asserting that the illness is not GBS. *In Re Swine-Flu Immunization Products Liability Litigation*, M.D.L. No. 330, Mis. No. 78–0040, ¶ IX (D.D.C.1979). While the plaintiffs are not bound by these criteria, *id.*, the Court finds that even under the NINCDS criteria, the definition of "GBS" includes the case with slow progression after onset.

While listing the main symptoms for the typical case of GBS, the NINCDS guidelines also list other considerations both supporting and detracting from a GBS diagnosis. Significantly, the criteria specifically recognize that there are variants of GBS, which, by their very inclusion in the outline, are necessarily included in the definition of GBS. With regard to progression, the guidelines note that approximately 90% of the cases of GBS will reach the nadir of the illness by four weeks after onset. Apparently, therefore, in approximately 10% of the cases of GBS, such a progression has not occurred. Importantly, the guidelines list a variant of GBS with regard to progression noted as "Progression beyond four weeks." This variant states that "[o]ccasionally a patient's disease will continue to progress for *many weeks longer than four* or the patient will have a minor relapse." (emphasis supplied). Numerous courts have decided that a case of GBS with a long progression after onset is a variant of GBS and definitonally is "GBS" within the context of Swine Flu litigation. *See Grubbs v. United States*, 581 F.Supp. at 536 (N.D.Ind.1984); *Dillard v. United States*, No. CV479–17, slip op. at 10–13

(S.D.Ga. October 30, 1981); *D'Antonio v. United States*, No. C–1–80–578, slip op. at 21–22 (S.D.Ohio February 4, 1983); *Vesperman v. United States*, Civil Action No. B–80–662, slip op. at 7–9 (D.Md. June 20, 1983); *Thompson v. United States*, Civil Action No. 79–1017–A, slip op. at 10–12 (E.D.Va. November 6, 1980); *Polzin v. United States*, Case No. M80–130, slip op. at 10–12 (W.D.Mich. December 29, 1982); *Warmouth v. United States*, File No. M79–69 CA, slip op. at 6–9 & n. 9 (W.D.Mich. February 14, 1984); *Adams v. United States*, No. 80 C 2383, slip op. at 8–10, 17–19 (N.D.Ill. April 19, 1984); *Edenfield v. United States*, Case No. 79–914 Civ–T–H, slip op. at 11 (M.D.Fla. June 1, 1983); *see also Carroll v. United States*, Civil No. H–79–1589, slip op. at 2–3 (D.Md. June 18, 1982) (case where government agreed that there is a chronic form of GBS which evolves over a long period and peaks many months after onset); *Spencer v. United States*, 569 F.Supp. 325, 328–31 (W.D.Mo.1983) (discussing court cases involving progressive form of illness, court decided that GBS was progressive form caused by swine flu vaccine, where acute phase was more than 17 weeks after vaccination and government did not raise "CIP" defense); *cf. Unthank v. United States*, 732 F.2d 1517, 1520 (10th Cir.1984) (court gave the term "GBS" a broad interpretation). *But see, e.g., Adleson v. United States*, 523 F.Supp. 459 (N.D.Cal.1981). *See generally Kynaston v. United States*, Case No. 79–241, slip op. at 6–9, 11–12 (D.Utah January 15, 1981).

Although statistically such variants do not occur that often, they do occur with sufficient frequency to be noted in the medical literature as variants of GBS. In the Second Edition of *Principles of Neurology*, Adams and Victor, Pls' Ex. 24, it is noted that "variants of the clinical picture are frequent." After the listing of other variants, it is noted that "[c]ases with *steady or stepwise progression over weeks or months,* some of which, show asymmetries of involvement, with recovery in some parts and worsening in others, are other variants." (emphasis supplied). In addi-

tion, in an article concerning the diagnosis of GBS and the NINCDS criteria, Dr. Asbury noted that the diagnosis criteria avoid the questions of "what are the real nosological limits of GBS, and which of the suspected variants share a common pathogenesis with the core disorder?" *Diagnostic Considerations in Guillain-Barre Syndrome,* Ann.Neurol. 9 (suppl): 1–5, 1981, at 3. With specific reference to the chronic forms of the disease, Dr. Asbury wrote that "[a]t the moment there is no clear method of delimiting GBS from more chronically evolving demyelinative neuropathies, either progressive or relapsing, except by an *arbitrary clinical judgment* as to temporal evolution." *Id.* at 4 (emphasis supplied). *See Vesperman v. United States,* Civil Action No. B–80–662, slip op. at 8–9 (D.Md. June 20, 1983).

Apart from the considerations just discussed, the Court notes with interest the opinion in *Unthank v. United States (In Re Swine Flu Immunization Product Liability Litigation),* 533 F.Supp. 703 (D.Utah 1982), *aff'd sub nom., Unthank v. United States,* 732 F.2d 1517 (10th Cir. 1984). The district court in *Unthank* was confronted with a plaintiff who alleged that the Swine Flu shot had caused her to contract transverse myelitis, which is a neurological syndrome affecting the central nervous system. The Court found that Mrs. Unthank could not establish the government's liability on the theory of negligence or strict liability. 533 F.Supp. at 714–16. The Court then proceeded to examine whether transverse myelitis should be considered "GBS" (generally considered to be a peripheral nervous system disorder) within the context of that litigation, thereby permitting Mrs. Unthank to establish liability solely by establishing causation. 533 F.Supp. at 716–19.

In addressing this question, the *Unthank* Court looked to the legislative history of the Swine Flu Act and to the official statement of then-Secretary of Health, Education and Welfare, Joseph A. Califano, that in cases where GBS was caused by the vaccine, no theory of liability need be prov-

en to hold the government liable for resulting damages. The Court noted at least one reference in the medical literature which included transverse myelitis within the " 'all embracing phrase' " "GBS". 533 F.Supp. at 719. The Court in *Unthank* indicated that based on this alone, it could hold that transverse myelitis "is within the definition, classification, and umbrella of GBS." *Id.*

Nevertheless, the *Unthank* Court chose not to rest its holding solely on this connection between transverse myelitis and GBS. The Court discussed in detail the legislative history and determined that "Congress evinced an intent that all valid claims against the government be compensated." *Id.* Further, the Court found that, like GBS, transverse myelitis was an anticipated risk from the Swine Flu vaccine. 533 F.Supp. at 720–721. Moreover, the *Unthank* Court felt it important that the government had "actively urged [the plaintiff] to incur this risk through an unparalleled effort" to have the population vaccinated. 533 F.2d at 720. The Court described the situation this way:

> A barrage of overwhelming publicity emanating from the highest reaches of government implored every American to be immunized. The President of the United States, in an unprecedented move on national television, pleaded for positive response by the American People. Like a true soldier responding to the call of the Commander in Chief, plaintiff responded and was immunized.

533 F.Supp. at 721.

Finally, the *Unthank* Court noted that "state and federal compensation programs have treated closely related diseases or disabilities" in the same manner. 533 F.Supp. at 721–22. The Court held that transverse myelitis is a disease sufficiently closely related to GBS so as to compel equal treatment under the Swine Flu Act. 533 F.Supp. at 722.

Based on these considerations, the Court in *Unthank* held that the plaintiff was entitled to recover from the United States, since she had proven that her case of transverse myelitis was proximately caused by the Swine Flu vaccination. This holding was made despite the plaintiff's failure to establish liability on any product liability theory. In essence, the Court applied to the case of transverse myelitis before it the stipulation entered into with regard to GBS, thus treating this central nervous system disorder as coming within the definition of "GBS".[1]

■ In the instant case, the situation is much the same. Even if a slowly progressive polyneuritis is technically a separate clinical entity from GBS, there is ample evidence in the record to demonstrate that this condition is much more closely related to GBS than is transverse myelitis. In fact, evidence already noted herein terms the distinction between a slowly progressive polyneuritis and GBS as an "arbitrary judgment." This would strongly indicate that the term "GBS" in the context of this litigation includes a slowly progressive polyneuritis. In addition, the very close connection between a long progressive polyneuritis and the classic case of GBS adequately shows that the former was as anticipated a risk of the vaccine as was the latter. Furthermore, the fact that the United States government actively promoted and encouraged the use of the vaccine is as it was in *Unthank*. And, of course, the legislative history as discussed in *Unthank* remains unchanged. This Court specifically adopts the *Unthank* Court's discussion of the legislative history. *See* 533 F.Supp. at 717–21; *see also Unthank v. United States,* 732 F.2d at 1519–20. Finally, this Court holds with respect to a slowly progressive polyneuritis, as did the *Unthank* Court with respect to transverse myelitis, that it is a disease so closely related to GBS

---

1. On appeal, the Court of Appeals for the Tenth Circuit affirmed that part of the district court's decision put forth here. *Unthank v. United States,* 732 F.2d at 1519–20. In addition, the Court of Appeals found the government liable to the plaintiff on the theories of inadequately informed consent and strict liability in tort, on which the district court had rejected liability. 732 F.2d at 1520–23.

that it deserves equal treatment under the remedial statute passed by Congress.

Based on the foregoing, this Court rejects the government's limiting definition of GBS and finds that GBS includes a rapid-onset of the illness, with a slow progression over months before eruption into the acute phase. The Court finds that its decision in this regard is supported by both the Court's discussion of GBS at pages 19–25, and the discussion of the *Unthank* opinions at 25–28 & n. 1. The Court further finds that each discussion provides a sufficient independent basis to support the Court's position. Thus, this Court need not decide whether the proper clinical characterization of a long progressive polyneuritis is CIP rather than GBS. Within the context of the litigation, this long progressive polyneuritis is definitionally "GBS".

C. *Causation*

■ The question before the Court is whether the plaintiffs have demonstrated that the Swine Flu vaccine Sandra Cardillo received on December 6, 1976 caused her to become ill with GBS. Based on all the testimony and the evidence in this case, the Court is of the opinion that the plaintiffs have satisfied their burden of proof that the Swine Flu vaccine was a proximate cause of Sandra Cardillo's case of GBS.

In reaching this conclusion, the Court finds that Mrs. Cardillo had neurological symptoms within a few weeks of the administration of the vaccine, which, at a minimum, took the forms of tingling in her fingertips, a scratchy, burning sensation at the back of her throat, and the weakness and tiredness she experienced.[2] The Court finds on the testimony before it that within 2 to 4 weeks of the vaccination Mrs. Cardillo was experiencing weakness which can be characterized as significant when compared to her state before the vaccination. Although she continued to go to work and perform essential household tasks, she stopped many of her activities, canceled a skiing trip, and wanted to lie down and rest as much as possible. While for some persons such activity might not be unusual, for Mrs. Cardillo this was a marked departure from the way she had previously lived. In addition, it was within this time frame that the sensations noted had occurred in her fingertips and throat. In sum, the Court finds that the onset of Mrs. Cardillo's case of GBS was within 2 to 4 weeks after she received the vaccine.

This onset is well within the time period after vaccination for which there is a strong showing of causation under even the government's interpretation of the epidemiological data. The Court notes that the crucial date for the epidemiological data is the date of onset, and not the date of the eruption of the disease. With the onset being within the period noted above, the data demonstrates that it is more likely than not that Mrs. Cardillo's case of GBS is causally related to the Swine Flu vaccine she received on December 6, 1976. Thus, the Court finds that this is not a "long-onset case" as the government argues, if that phrase is taken to mean onset occurring long after an identifiable antecedent event. Instead, it is a short onset case of GBS, with a long progression over the next 13 to 15 weeks, with the time of onset establishing that the GBS was more likely than not causally related to the Swine Flu shot.

Furthermore, even if the Court were to view the epidemiological data as applicable only to an acute or subacute progression of GBS and not to a slowly progressive polyneuritis, the Court would still find that the plaintiffs have sustained their burden of proof in this case. Prior to receiving the vaccine, Mrs. Cardillo was not tired and weak, nor is there any evidence that she mentioned to anyone a tingling sensation in her upper distal extremities or a scratchiness in the back of her throat. Only shortly after the vaccination did she experience

2. With respect to the change in her bowel habits since the onset of her illness, Dr. Rhamy testified that this was likely a result of involvement of her illness with the autonomic nervous system. While the Court does not heavily rely on this testimony in finding the causal connection in this case, testimony indicates that such an autonomic system involvement is compatible under a slowly progressive polyneuritis.

these symptoms. And it was these conditions which were significantly involved when Mrs. Cardillo's GBS erupted in early April of 1977. Moreover, both the involvement of the bulbar muscles and a descending progression are unusual for this illness. Nevertheless, Mrs. Cardillo had these unusual conditions when the disease erupted, and her early symptoms were consistent with this atypical course of the illness. In addition, the plaintiffs have shown that there was no other medically identifiable cause of the scratchiness in her throat or the tingling in her fingertips. Taken together, all of these circumstances demonstrate the causal connection.

The government argues that it is more likely than not that it was a gastrointestinal virus in late March of 1977 rather than the Swine Flu vaccine which caused Mrs. Cardillo's case of GBS. The Court does not agree. It is highly unusual for the onset of the illness to be so close to the antecedent event. Under the government's theory, the date of the antecedent event would be March 30, the first day of an alleged gastrointestinal virus. The date of onset, however, was at the latest April 3rd, and possibly April 1st. Thus, the onset was within two, or at most four, days of the antecedent event. The most conservative evidence in this case suggests that generally onset follows an antecedent event by a week or two, and in some cases by up to three weeks. While there is evidence in the record that onset can follow an antecedent event by only five or six days, such is clearly a rare case. There is nothing in the record to suggest that it is other than an extremely rare case to have onset follow the antecedent event by only two to four days. The government would have the Court believe that this statistically unlikely event occurred rather that the statistically unlikely event of a long progressive GBS variant. Yet the presence of Mrs. Cardillo's symptoms of weakness, upper distal extremity tingling, and the scratchiness in her throat within 2 to 4 weeks of the vaccination, together with the manifestation of these symptoms during the acute phase of

her illness, all point to the occurrence of the latter statistically unlikely event.

At a minimum, Mrs. Cardillo had a pre-existing slowly progressive polyneuritis as a result of the vaccine which was ignited into the acute phase by a gastrointestinal virus in late March of 1977. Even assuming that there was such a virus and that this virus has this catalytic effect, the Swine Flu vaccination is no less a proximate cause of her illness.

The government argues that Sandra Cardillo's husband, sons, mother and father-in-law and friends are attempting to backdate Mrs. Cardillo's neurological symptoms. This attempt, the government asserts, should be rejected by the Court, which should rely instead on the medical records in evidence. However, having examined the medical records, the Court does not find that they preclude believing the testimony of these witnesses.

The testimony of the family and friends tells the same basic story about a vibrant woman who, shortly after receiving a Swine Flu shot, became lethargic and weak. While each witness observed different aspects of Mrs. Cardillo's activities, each indicated the same general perception of her condition. In addition, Charles Cardillo, Charles, Jr., and Nancy Minor testified about her attempts to clear her throat, which correspond to Mrs. Cardillo mentioning to her husband that she had a scratchy, burning sensation in the back of her throat. Also, both Charles Cardillo and Nancy Minor noted conversations with Mrs. Cardillo regarding the tingling in her fingertips. While the family members have an obvious pecuniary interest in the outcome of this litigation, the Court nevertheless found them to be forthright and candid in their testimony. In short, the Court finds their testimony of these symptoms to be highly credible. The same can be said of the testimony of Nancy Minor and Linda Murdy, who have no apparent pecuniary interest in the outcome of this case.

The testimony of Dr. Lichtenfeld supports the credence which this Court gives to the testimony of the family and friends.

When Dr. Lichtenfeld took a history of Sandra Cardillo from the family and friends, the notations of the tingling in her fingers and particularly the sensation in her throat were of peculiar importance to him. Dr. Lichtenfeld has significant clinical experience with cases of GBS of many varieties, including cases involving an early onset with slow progression over a period of months. His experience with the latter type of cases led him to observe that the symptoms experienced at onset are generally the ones which are most prominent when a slowly progressing case of GBS erupts into the acute phase. With the eruption of Mrs. Cardillo's illness, she had severe involvement with muscles in her throat causing her serious difficulty swallowing. Moreover, she had the tingling sensation in her fingertips, as she had experienced at onset. In addition, it was her upper extremities that were first effected by paralysis with progression over time to her lower extremities. As previously noted, this is the reverse of the usual progression of GBS, which is from lower extremities to upper, and is consistent with the lack of specific testimony concerning neurological symptoms in her lower extremities at the time of onset. Thus, the government's argument that there was no evidence that Mrs. Cardillo had difficulty walking prior to April of 1977 is of little import considering her descending case of GBS.

The review of the medical records in evidence does not bring this Court to reject what it otherwise regards as credible testimony. The government argues that the medical records of Dr. White's examination of Mrs. Cardillo in March of 1977 and the records relating to her hospitalization in April of 1977 tend to establish that prior to March 30, 1977, Mrs. Cardillo had no prior neurological symptoms. A necessary corollary to this is either that the group of family and friends fabricated a story, or each such witness honestly mistakenly believed a remarkably similar story. The Court refuses to accept either implication, in part because this "story" had a peculiar enough plot to convince Dr. Lichtenfeld of its veracity.

The government argues that answers which Mrs. Cardillo gave to various questions on a March 23, 1977 questionnaire during a visit to Dr. White establishes that she had no such neurological problems prior to that date. The Court rejects this assertion. This brief examination was one which Mrs. Cardillo was required to take by her employer if she was to retain her bus driver's license. Dr. White explained that usually people who have an exam like this are going to minimize their history. (Exh. 585, p. 35.) With regard to the questionnaire, the government ascribes particular significance to Mrs. Cardillo's "no" answer to the question concerning tuberculosis. The government also noted that Mrs. Cardillo answered "no" to the same question during two earlier visits to Dr. White. Each of these visits was also for the purpose of keeping her bus driver's license. To this Court, the significance of these "no" answers to the tuberculosis question is to lend strong support to Dr. White's theory that people tend to minimize their history during such exams. The Court notes that Mrs. Cardillo's "no" response to the back-pain question on the March 1977 questionnaire could also be viewed as untruthful, considering her complaint of back pain to her gynecologist in September of 1976. From the circumstances of this examination and the untruthful answers Mrs. Cardillo gave to some of the questions, the Court gives little credence to Mrs. Cardillo's other "no" responses which related to the relatively mild GBS symptoms she had been experiencing. Instead, the Court views this question as one to which there was a significant incentive to answer "no" even if the truthful answer was "yes." Due to the relatively mild nature of her symptoms to that point, it is highly likely that this is exactly what occurred.

With respect to the histories elicited when Mrs. Cardillo went to the emergency room on the evening of April 4, 1977 and thereafter, different considerations arise. Clearly at those times there was no incentive for Mrs. Cardillo or Charles Cardillo to

give inaccurate information. However, under the circumstances in which these histories were taken, the Court is not persuaded to disbelieve the family and friend witnesses whose testimony places the onset of her symptoms within 2 to 4 weeks of her vaccination.

When Mrs. Cardillo was first brought to the emergency room, a major concern was whether she was suffering from an allergic reaction to the paint she and her husband used the previous day. It was on this theory that Mrs. Cardillo was sent to an ear, nose and throat specialist. Later that day, when Mrs. Cardillo went to the emergency room of the World War II Veterans Hospital, one of the chief concerns was botulism. Even when Mrs. Cardillo was transferred to Yale-New Haven Hospital, botulism was still thought to be a possible diagnosis.

Charles Cardillo testified that there was substantial confusion, that he was very upset, and that by the time Mrs. Cardillo was at the World War II Veterans Hospital she had difficulty verbally relating her history. His testimony is that he helped supply her history to Dr. Friedman. It is clear from the record that both Mr. and Mrs. Cardillo were very upset, confused and worried at this time. Due to her condition and the disturbing surrounding circumstances, it is likely that Mr. Cardillo rather than Mrs. Cardillo gave much of her history to Dr. Friedman. Indeed, Dr. Friedman's history states that Mrs. Cardillo had no prior history of tuberculosis. It is likely that if Mrs. Cardillo had given the information in this regard, Dr. Friedman would have noted her tuberculin condition in this history. On the other hand, Mr. Cardillo could not have provided this information since Mrs. Cardillo never told Mr. Cardillo of her tuberculin condition.

As previously noted, Mrs. Cardillo's condition had seriously deteriorated by the time she arrived at Yale-New Haven Hospital. Although the indotracheal tube inserted at the Veterans Hospital had to be repositioned at Yale-New Haven Hospital, the record shows that Mrs. Cardillo was intu-

bated upon arrival at Yale-New Haven and thereafter. It is clear, then, that she was unable to verbally communicate with the doctors due to the tube in her trachea. Moreover, Mrs. Cardillo's neurological symptoms had greatly impeded her ability to speak. Hence, the histories of Dr. Higgins, Dr. Nathanson, and Dr. Root came primarily from Mr. Cardillo, possibly to some minor extent from Mrs. Cardillo's parents, and from Mrs. Cardillo only to the extent that she was able to move her toes to indicate a positive or negative response.

In retrospect, it would have been better (at least for purposes of this litigation) if Charles Cardillo, when asked to supply Mrs. Cardillo's medical history, had been able to connect Mrs. Cardillo's intermittent complaints of weakness, a scratchiness in her throat, and tingling in her fingertips, with the explosive eruption of GBS which occurred in early April of 1977. However, in his mind at the time the histories were taken, he did not make this connection.

Mr. Cardillo testified that the immediate focus was on an allergic reaction to paint and the possibility of tracking down the source of a potential case of botulism. The eruption of Mrs. Cardillo's GBS was an abrupt and severe departure from her prior state. Although her prior state had itself been a marked change from her state before the vaccine was administered, her symptoms were intermittent and relatively mild, and without any apparent serious affects. The Court notes that Mrs. Cardillo was not constantly complaining for 16 weeks after the vaccination. The testimony shows that she was not the complaining type. Mrs. Cardillo did not run out to the doctor at the first sign of discomfort after the vaccine, nor did Charles insist that she do so. For almost three months the family became accustomed to Mrs. Cardillo's slowed pace. The connection between these relatively minor changes and this acute eruption did not immediately suggest itself to Mr. Cardillo. This Court finds that, under the circumstances, this was understandable. Moreover, later in the spring when Mr. Cardillo made this connec-

tion and inquired of Dr. Moench concerning a causal relationship between the Swine Flu vaccine and Mrs. Cardillo's GBS, the Doctor rejected this possibility because of the time lapse.

The Court finds under these circumstances that Mr. Cardillo could not reasonably have been expected to provide the information which the government notes is absent from the histories. The government attempts to test Mr. Cardillo's actions against too stringent a measure—a measure which in large part is derived from the benefit of perfect hindsight. The Court finds that the same applies to Mrs. Cardillo, to the extent she was able to give her history at both the Veterans Hospital and Yale-New Haven Hospital.

After consideration of the facts, as found by the Court, and the many expert medical opinions offered in this matter, the Court assigns to Dr. Lichtenfeld's testimony the greatest weight. The Court finds Dr. Lichtenfeld to be persuasive, particularly considering his conclusions drawn from his clinical experience with cases of slowly progressive polyneuritis. The Court noted and finds his manner to be straightforward and convincing, and the substance of his testimony to be worthy of substantial weight.

Conversely, on the issue of causation on the facts as found, the Court does not afford the government's medical testimony similar weight. Much of the testimony of the government doctors was devoted to explaining that a slowly progressive polyneuritis is not "GBS", a position which this Court has rejected in the context of this litigation. The doctors thus rendered their expert opinions generally on a much narrower definition of GBS than the Court has found applicable. This is true with regard to both Dr. Adams and Dr. Victor. Moreover, both doctors based their opinion to a significant degree on an interpretation of epidemiological data which does not show a high relative risk figure for onset at 17 weeks after vaccination. This Court, how-

ever, has found onset occurred between 2 to 4 weeks after vaccination.

With regard to Dr. Lewis, the Court found his testimony to be of little value. His examination of the records at times can only be characterized as cursory. Based on the substance of his testimony as well as his demeanor on the stand, the Court did not find Dr. Lewis to be persuasive.

In large measure, both Dr. Hughes and Dr. Winkler based their opinion that the Swine Flu vaccine did not cause Mrs. Cardillo's GBS on epidemiological data. Each stated that too much time had elapsed between the vaccination and the onset of the symptoms to establish a causal relationship. These doctors were assuming onset occurred between 16 and 17 weeks after vaccination. Thus, Dr. Hughes' and Dr. Winkler's opinions do not apply to the facts as this Court has found them.

Dr. Kurland's testimony was chiefly concerned with epidemiology. His testimony was directed to the epidemiological data connecting GBS and the Swine Flu vaccine. His testimony addressed whether there is an epidemiological basis for a causal connection when the onset of symptoms is 16–17 weeks after vaccination. In view of this Court's finding that Mrs. Cardillo's onset of mild symptoms occurred between 2 and 4 weeks after vaccination, Dr. Kurland's testimony does not detract from the causal relationship.

The doctors who testified via video tape deposition from the Multi-District Litigation proceedings likewise do not weigh heavily against the finding of a causal connection in this instance. These doctors did not address the specifics of Mrs. Cardillo's case in any way. The substance of the testimony dealt with the background and general circumstances of the disease, and epidemiological data related to GBS.

In sum, the Court finds that the plaintiffs have proven that the Swine Flu vaccine was a proximate cause of Mrs. Cardillo's illness. The Court bases this conclusion on the plaintiffs' first theory of causation.[3] Therefore, this Court need not ad-

3. The Court notes that there is evidence in the

record that persons with chronic polyneuritis

dress the plaintiffs' second theory of causation which posits Mrs. Cardillo's onset at 17 weeks and argues that a proper interpretation of the epidemiological data supports a causal connection with the Swine Flu vaccine for that onset date.

### D. *Damages*

The parties in this case have agreed to medical expenses totalling $397,406.86. Plaintiffs' Post Trial Brief, at 65. The parties have also stipulated to Mrs. Cardillo's lost earnings in the amount of $135,024.00. *Id.* Plaintiff is entitled to funeral expenses of $2,364.70. Conn.Gen.Stat. § 52–555 (1969). The total of these sums is $534,795.56.

■ The plaintiffs are entitled to an award of damages for Mrs. Cardillo's pain and suffering. On this record, the Court finds that Mrs. Cardillo suffered a torturous form of pain and suffering at least from the morning of April 4, 1977 to April 14, 1977, when the respirator to which she was connected at Yale-New Haven Hospital was found disconnected. In addition, beyond that date through the time of her death, there is ample evidence to find that Mrs. Cardillo had sufficient cognitive ability to experience pain. While the medical records do not permit the Court to find this to a certainty, they do make it more likely than not.

The Court has already noted her condition in some detail through mid-June of 1977. From these medical records, and from medical records for later dates, it appears that Mrs. Cardillo had some ability to understand her surroundings so as to respond to requests. On June 20, 1977, it was noted that Mrs. Cardillo was "very alert ... [and] turns to sound, ... but does not accommodate to stimulus." (Exh. 501, at 158.) The next day Dr. Moench wrote that he believed Mrs. Cardillo had shown a "slight but definite restitution of neural function." *Id.* at 160. On June 22nd, it was noted that she was occasionally turn-

ing her head and eyes on command. *Id.* at 162. Dr. Nathanson, on June 27th, noted that Mrs. Cardillo was quite alert and turned to his voice. *Id.* at 168. In July of 1977, the nurses who cared for Mrs. Cardillo noted that she was alert, moved her toes on both feet and an arm on command and looked toward them when her name was called. *Id.* at 478, 485, 486.

By August 10, 1977, Dr. Moench noted a suggestion of verbal and visual conscious contact. *Id.* at 175. Eight days later, Dr. Moench wrote that Mrs. Cardillo "turned away from [her] husband toward [her] son's voice.... [I] believe this reflects continuing reintegration of neural function and [I] think [patient] has potential for continuing recovery process." *Id.* at 177. Nine days later, Dr. Pellegrino noted that Mrs. Cardillo made occasional purposeful movements, with much improved head control, although her response to specific commands was still minimal. *Id.* at 183.

Early in September of 1977, Dr. Pellegrino noted that Mrs. Cardillo had reasonable head control but made few if any "purposeful directed movements on command or in response to stimuli." *Id.* at 189. For a period thereafter, her neurological state appeared unchanged. By December 10, 1977, Dr. Moench noted that Mrs. Cardillo was "somewhat more alert," and that she moved her extremities and winked on request. *Id.* at 237. Yet two days later, she did not respond to verbalization. *Id.* A week later, Dr. Pellegrino noted that Mrs. Cardillo was generally awake and alert and appeared to sporadically obey simple commands such as to chew or close her eyes. *Id.* at 243. Nevertheless, Dr. Pellegrino felt that there was little convincing evidence for significant higher cortical function and "little further improvement" was expected. *Id.*

On the last day of 1977, Dr. Pellegrino noted that Mrs. Cardillo "made semi-purposeful movements of all her extremities

---

tend to have elevated protein levels in the spinal fluid. However, the record does not indicate that this tendency must be so at all times during the illness. Indeed, Dr. Lichtenfeld testified that the protein level can vary greatly and can be in the normal range through much of the illness.

and had a fair degree of head control when sitting." *Id.* at 250. He further noted that "at her best she appears to be awake [and] alert and is able to carry out very simple one-step commands (e.g. look out the window, open mouth, etc.) In general her level of function is not that good, and frequently she is nearly unresponsive." *Id.* at 250–51. It appears that she remained in this state through the end of her stay at Yale-New Haven Hospital on January 31, 1978.

Mrs. Cardillo was admitted to New Britain Memorial Hospital on February 1, 1978, where she remained until September 6, 1983. During this five and one half year period, the hospital records tend to show no neurological change.

The medical records concerning Mrs. Cardillo's stay at the Meriden-Wallingford Hospital after September 6, 1983 indicate that her state of alertness continued until shortly before her death. The doctor's notes of September 21, 1983 are as follows: "[she] [a]ppears to acknowledge and understand me." (Exh. 501, Vol. III at 33.) The doctor felt that although neurologically she may not have been able to talk, perhaps some method could be used "for rudimentary communication." *Id.* Over a week later, the same doctor noted that the physical condition of her throat was "unfortunate" because he felt Mrs. Cardillo otherwise "could have at least communicated with sounds." *Id.* at 35.

There are numerous other notations in the records during this time reporting her alert state. *Id.* at 115, 116, 117, 118, 223, 224, 226, 228, 232, 234, 236, 238, 240, 242, 244, 246, 250, 252, 254, 258, 260, 262, 264, 266, 268, 269, 270, 272, 274, 276, 278, 282, 284, 286, 288, 290, 292, 295, 297, 298, 299, 301, 303, 307, 309, 311, 312, 313, 315, 317, 319, 321, 322, 324, 326, 328, 330, 332, 334. The nurses responsible for Mrs. Cardillo's care noted the following on different occasions: she was responsive to touch and painful stimuli (*id.* at 269); she made "strong eye contact", shook her head "no" and made throat sounds (*id.* at 312); and she appeared anxious when her "trach care equipment [was] opened." *Id.* at 323. Moreover, one nurse indicated that Mrs. Cardillo was "laughing [at] conversation between staff." *Id.* at 298.

Faced with this record, the Court concludes that during the time between April 14, 1977 and her death, Mrs. Cardillo was capable of experiencing pain and suffering from the conditions she endured. Based on the evidence on the record, it appears that from April 14, 1977 on, Mrs. Cardillo had this capability, at least on an intermittent basis.

The Court, therefore, finds that Mrs. Cardillo is entitled to damages for the pain and suffering she endured. Although there is no mathematical formula or iron-clad rule for the assessment of such damages, *Manning v. Michael*, 188 Conn. 607, 616, 452 A.2d 1157 (1982), the Court finds $3,500,000.00 to be fair and reasonable damages for the pain and suffering of Mrs. Cardillo from the onset of her illness through her death.

In awarding damages in this case, the Court is limited to a total award of $5,000,-000.00 because of the amount demanded in the applicable administrative claim.[4] Dam-

---

**4.** This Court denied without prejudice defendant's motion to reduce plaintiffs' *ad damnum* claim from $6,000,000.00 to $1,000,000.00 based on the administrative claim filed July 7, 1977. This motion was not renewed in writing.

In any event, a superceding administrative claim was filed after Mrs. Cardillo's death demanding a total of $5,000,000.00 in damages. This second administrative claim added the claim for wrongful death and specifically enumerated Mr. Cardillo's claim for loss of consortium. On June 26, 1984, an amended complaint was also filed demanding $5,000,000.00 for all

damages other than loss of consortium and $1,000,000.00 for Mr. Cardillo's individual claim for loss of consortium, resulting in a total claim of $6,000,000.00.

The amount of damages demanded in the second administrative claim dated December 20, 1983 places a jurisdictional limit on the damages this Court may award. There is no exception to this jurisdictional limit since the record reveals neither newly discovered evidence nor intervening facts between the filing of this administrative claim and the amended complaint on June 26, 1984. 28 U.S.C.

ages awarded thus far for pain and suffering, medical expenses, lost earnings and funeral expenses total $4,034,795.56. Therefore, the maximum amount of damages recoverable by the plaintiffs on the remaining claims is $965,204.44.

█ The Court recognizes the inherent difficulty of "measur[ing] the loss of the gift of life." *Kiniry v. Danbury Hospital,* 183 Conn. 448, 439 A.2d 408 (1981). Nevertheless, the Court is obligated to do so. Considering all the evidence in this case, including the age of Mrs. Cardillo, her good health prior to the vaccination, and the probability that she would have continued to live a full and happy life, the Court finds that the value of the loss of Mrs. Cardillo's life exceeds $965,204.44. Given the jurisdictional limit, however, the Court need not decide the exact amount by which the value of her life exceeds $965,204.44.

The Court notes that a majority of the Connecticut Supreme Court in *Kiniry v. Danbury Hospital,* 183 Conn. 448, did not disavow as excessive an amount greater than $1,000,000.00 for the value of the loss of life. Indeed, under less compelling circumstances, the United States District Court for the Eastern District of Texas appears to have awarded a greater amount for the value of the loss of life. *Alberta Migues v. Nicolet Industries,* 493 F.Supp. 61 (E.D. Texas 1980), *aff'd in part, rev'd in part, both on other grounds, sub nom, Alberta Migues v. Fibreboard Corp.,* 662 F.2d 1182 (1981) ($1,500,000.00 awarded on wrongful death claim of male with limited capacity for future earnings who died shortly after his illness was diagnosed). Under the wrongful death claim, the Court hereby awards the plaintiffs $965,204.44 in damages for the value of the loss of Mrs. Cardillo's life, bringing the total award to $5,000,000.00.

The government has moved to dismiss Mr. Cardillo's individual claim for loss of consortium. As previously noted, the Court has already reached its jurisdictional limit with regard to damages. This limit is

§ 2675(b). Therefore, despite the *ad damnum* clause of the amended complaint, the total dam-

imposed by the second administrative claim which explicitly included Mr. Cardillo's claim for loss of consortium. The Court is precluded from awarding further damages and therefore, need not decide this issue.

It is SO ORDERED.

ages awarded by this Court cannot exceed $5,000,000.00.